UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | | |
|---|---|---|---|
| DONNA LAWSON, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | No. 4:13CV1361SNLJ |
| | ) | (TIA) |
| CAROLYN W. COLVIN, | ) | | |
| Acting Commissioner of Social Security, | ) | | |
| | ) | | |
| Defendant. | ) | | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This cause is on appeal from an adverse ruling of the Social Security Administration. The

suit involves an Application for Disability Insurance Benefits under Title II of the Social Security

Act. Claimant has filed a Brief in Support of her Complaint; the Commissioner has filed a Brief in

Support of her Answer; and Claimant filed a Reply thereto. The case was referred to the

undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b).

## I.     Procedural History

On March 22, 2011, Claimant Donna Lawson filed an Application for Disability Insurance

Benefits under Title II of the Act, 42 U.S.C. §§ 401 et. seq. (Tr.145-51)[1] alleging disability since

February 25, 2009 due to left shoulder pain, neck pain, headaches, depression, muscle spasms,

hives/allergic reactions, and knots in shoulder blade. (Tr. 94). The application was denied, and

Claimant subsequently requested a hearing before an Administrative Law Judge (ALJ), which was

held on May 8, 2012. (Tr. 6, 95, 27-77, 95-99). Claimant testified and was represented by

---

[1]"Tr." refers to the page of the administrative record filed by Defendant with its Answer.
(Docket No. 10/filed September 19, 2013).

counsel. (Id.). Vocational Expert Dr. Jeffrey Magrowski also testified at the hearing. (Tr. 59-70, 110-13). In a decision dated May 23, 2012, the ALJ issued a decision denying Claimant's claims for benefits. (Tr. 7-22). After considering the treatment notes from Mercy Clinic and Dr. James Felts' Medical Source Statements, the Appeals Council on May 20, 2013 found no basis for changing the ALJ's decision and denied Claimant's request for review of the ALJ's decision. (Tr. 1-5, 578-89). The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.     Evidence Before the ALJ

### A.  Hearing on May 8, 2012

#### 1.  Claimant's Testimony

At the hearing on May 8, 2012, Claimant testified in response to questions posed by the ALJ and counsel. (Tr. 27-77). She is right-handed and lives in Rolla with her disabled husband. (Tr. 37, 40). She cooks easy meals in the microwave and washes the clothes. (Tr. 41). Claimant testified that she has a driver's license and drives to the grocery store twice a week and does her own housecleaning. (Tr. 38, 50). Claimant completed the tenth grade and has trouble reading and writing. (Tr. 31, 40). She was fifty-two years old at the hearing. (Tr.30). Claimant receives Medicaid and food stamps in the amount of $250 per month. (Tr. 30-31).

Claimant testified that she has gained fifty pounds due to the stress. (Tr. 47). She stands at five feet seven inches and weights 282 pounds. She testified that she has problems reading and writing, and her attorney filled out the forms for the hearing, because she could not understand the forms. (Tr. 47-48).

Prior to her injury, Claimant enjoyed crocheting, playing bingo, going swimming, and

doing things with her grandchildren.  (Tr. 48).  Her arm pain prevents her from crocheting.  (Tr. 48).  Claimant cannot lift her grandchildren because of her back and arm pain.  (Tr. 49).

Claimant experiences tingling in her right leg caused by sitting for a period of time or standing.  (Tr. 39).  She has experienced this problem for a couple of years, but she now experiences pain shooting into her right leg and sometimes her left leg.  (Tr. 39).  Claimant testified that her doctor told her the sciatic nerve caused the tingling and prescribed physical therapy for her back as treatment, and she has completed three to four weeks.  (Tr. 40).  She reported to her doctor the physical therapy has not helped and in fact made her pain worse.  (Tr. 40).

Claimant explained how she injured her left shoulder when she lifted her husband.  (Tr. 41).  She was treated for months for a pulled muscle but after having a MRI, she had surgery on her rotator cuff.  (Tr. 43).  Claimant testified that after the surgery, she was not able to use her left arm like she could before and so she had a nerve conduction study.  The study showed no nerve problems.  (Tr. 43).  Although Dr. Klein wanted to do another MRI, Medicaid would not pay for the MRI, and she was released back to her family doctor.  (Tr. 44).  Her left arm still hurts from under her shoulder down her arm and taking hot showers loosens her arm.  (Tr. 44).

Claimant sought treatment in the emergency room on October 6, 2008, after slipping and falling on ice in a parking lot.  (Tr. 45).  The ALJ questioned whether this fall caused her rotator cuff injury, but Claimant indicated she was uncertain.  (Tr. 46).  Claimant testified she returned to work the next day but her arm locked up, and she was sent to a doctor who found she had pulled muscles.  Although she did not go to vocational rehabilitation, she had physical therapy and this did not help.  (Tr. 46).

Claimant last worked on February 25, 2009, as a patient care assistant. (Tr. 42). She testified she injured herself in October 2008, and so she worked in the kitchen doing light duty work but she was let go in February. Claimant testified she did no lifting while on light duty but only could help pull up a patient from a chair. (Tr. 42). After someone complained, Claimant was released from Phelps County Hospital, because she could not work at 100 percent. (Tr. 43). She explained how when she requested assistance to remove the CPM from the bed, the director discharged her. (Tr. 56).

Claimant worked as a medical care assistant and a stocker at the Dollar Store. (Tr. 49). Claimant then worked in the laundry department at Zino's and at Phelps County Regional Hospital in health care. (Tr. 49-50). She testified that she could not stock shelves because of the lifting and standing requirements. (Tr. 50). She could not return to work as a home health care provider because of the lifting required and the helping of people in and out of the bathtub. (Tr. 50). She testified that she could not stand at the jobs for eight hours nor could she sit for six hours a day. (Tr. 51). Claimant indicated that she did not think if given the option to sit or stand, she could not do that for periods of six to eight hours a day because her lower back would start hurting. (Tr. 51-52).

Claimant testified that Dr. Felts prescribed pain pills and muscle relaxers. (Tr. 52). She receives treatment from a nurse practitioner at the St. John's Clinic in Rolla. (Tr. 52). She experiences occasional headaches and pain in her back at level seven and pain in her left hip at level eight or nine. (Tr. 55). She rated her left shoulder pain at level eight/nine. Claimant takes Vicodin for her pain. (Tr. 55). Claimant has crying spells a couple times a week caused by thinking about what she can no longer do. (Tr. 56).

Claimant wakes up around 10:00, because she cannot fall asleep until 3:00a.m.sometimes. (Tr. 49). After getting up, she goes to the kitchen table and smokes a couple of cigarettes and drinks some orange juice. She usually takes an hour and half nap in the afternoon, because she is tired. (Tr. 49). She can use a computer for fifteen to twenty minutes until her left shoulder starts to hurt and tighten up. (Tr. 57-58). Claimant indicated that before Christmas, she was able to use the computer. (Tr. 58). She checks her email on her smart phone. (Tr. 59). Claimant testified that she can walk a half a block, but then her leg starts tingling. (Tr. 52). Her left leg has given out twice in the past six months. (Tr. 53). When bending she is scared her knees are going to go out. (Tr. 53). She can lift a gallon of milk and hold the handle in her left hand, but she has to support the gallon with her other hand. (Tr. 53).

## 2. Testimony of Vocational Expert

Vocational Expert Dr. Jeffrey Magrowski testified in response to the ALJ's questions. (Tr. 60-70). Dr. Magrowski summarized her past jobs as follows: part time cheerleading coach, a laborer at a bookstore, and a cashier, all light exertional jobs and semiskilled but as performed by Claimant, medium. (Tr. 61). As a laborer, she lifted twenty-five pounds, and the job has a DOT title of production helper which is medium and unskilled in the national economy. Her job in patient care was an orderly, a heavy semiskilled job. (Tr. 61-62). She worked full time as a patient care assistant from July 2001 through February 2009. (Tr. 62). Dr. Magrowski opined that none of the skills she learned as a patient care assistant would be transferrable to other occupations at the light or sedentary exertional level. (Tr. 63).

The ALJ asked Dr. Magrowski to assume that

a hypothetical individual of the claimant's age, which was 49 at the alleged onset

date, with the same education, or tenth grade. And the past, the past jobs you described. And really it looks like the only two that can be found to be past relevant work are the production helper and the orderly. And further assume the individual is limited to, limited lifting with the left arm to 20 pounds occasional, and ten pounds frequently. And then avoid lifting with the left arm extended away from the body and shoulder. And avoid excessive lifting or working with the left arm above shoulder level. And then if required to perform exertional activities for an extended time, the hypothetical individual would require frequent breaks. And this is to avoid exacerbation of injury to this left arm or shoulder restriction we have. Can the hypothetical individual perform any of the past jobs...?

(Tr. 63-64). Dr. Magrowski opined that such an individual could not perform any past relevant work, because such jobs were either heavy or medium in physical exertion which requires lifting of at least fifty to one hundred pounds. (Tr. 64). The ALJ noted that Claimant's non-dominant extremity is the one that has the limitation. (Tr. 64). Dr. Magrowski note that she could perform other work such as an usher, light and unskilled with 1,000jobs in Missouri and 30,000 in the national economy; a cashier in a parking lot, light and unskilled with 6,000 in Missouri and over 300,000 in the national economy; an office helper, light and unskilled with 4,000 in Missouri and 200,000 in the national economy. (Tr. 64-65). Dr. Magrowski explained such jobs do not require lifting with both hands overhead. (Tr. 65).

Next, the ALJ asked Dr. Magrowski to assume the additional information:

if the hypothetical individual, in addition to the restriction in hypothetical one, had to, had to alternate positions, sitting and standing every 30 to 60 minutes, would those jobs that you gave me, would they remain?

(Tr. 66). Dr. Magrowski responded no, the usher job would be eliminated, but the cashier and office helper jobs would remain. (Tr. 66).

Counsel asked Dr. Magrowski to assume "if the hypothetical claimant was required to have an unscheduled break that was approximately one hour in length where they had to go lay

down due to fatigue, would that eliminate the jobs that you've suggested here today?" (Tr. 67). Dr. Magrowski responded yes. Next, counsel asked him to assume "if the hypothetical claimant had emotional spells during the working day, and it diminished their capacity to perform 20 percent of their work, or enough time to recover from the emotional episode, would that also disqualify these two positions that are left in this hypothetical answer?" (Tr. 67). Dr. Magrowski responded he thought so and no competitive work would be available to the hypothetical individual. (Tr. 67, 69). Dr. Magrowski agreed that if the hypothetical person was unable to perform a sit or stand position over the course of six to eight hours, this would eliminate the positions he cited. (Tr. 67). Next, counsel asked if a tenth grade education with trouble reading and doing math, would those limitations impair the ability to perform jobs as a cashier or office helper? (Tr. 67). Dr. Magrowski noted such jobs would require an individual to keep notes and records in a minimal capacity at the unskilled level. (Tr. 68). Dr. Magrowski opined that unskilled work requires basic reading, writing, and math and that she could not have performed the jobs in the past if she could not at least read and write some. (Tr. 68). Dr. Magrowski noted there is a good correlation that an individual who worked as a patient attendant for nine years would have the basic reading, writing, and math. (Tr. 69).

The ALJ stated she would not keep the record open so that counsel could submit the additional medical records from Dr. Felts and the St. John's Clinic in Rolla, but if counsel submitted the records before she issued a decision, the ALJ would consider the records. (Tr. 70-76, 578-89).

### 3. Forms Completed by Claimant

In the Function Report - Adult, Claimant listed her daily activities to include sitting at the

kitchen table drinking orange juice and smoking a few cigarettes and sometimes making breakfast for her husband. (Tr. 189). She then makes the bed and does chores around the house. Claimant spends most the day at the kitchen table, and she sometimes makes dinner. (Tr. 189). Claimant reported taking care of her husband and tries to do what she can to make him more comfortable. (Tr. 190). Claimant indicated that she does not have any medicines inasmuch as she cannot get any medications. (Tr. 191).

In the Function Report Adult - Third Party, Vicki Harms, Claimant's friend, reported getting together once a month to out to lunch or visiting for one to two hours. (Tr. 201). Ms. Harms reported how Claimant takes care of her husband by taking him to the doctor and sometimes cooking. (Tr. 202).

## III.    Medical Records

On October 2, 2008, Dr. Mary Burns, DO, treated Claimant for left arm pain. (Tr. 275). She reported the pain starting the night before at work when putting a patient to bed, and the pain increasing as she continued to work. Dr. Burns diagnosed a left arm strain after examining Claimant. (Tr. 275-76). In follow-up treatment on October 9, 2008 for left arm pain, Claimant reported her pain being better and being able to move her arm except overhead. (Tr. 273). She went to the emergency room on October 6, 2008 and received two Vicodins. (Tr. 273, 447-48). The x-ray of her left shoulder showed calcific tendinosis and no evidence of a fracture. (Tr. 278, 449). Examination showed pain in palpitation. (Tr. 274). On October 30, 2008, Claimant reported her left arm pain had improved. (Tr. 271).

Claimant started physical therapy on October 16, 2008 as treatment for her pain and strain to her left shoulder in the first week of October. (Tr. 341). She reported sustaining a strain in her

shoulder and then waking up in the morning and being unable to raise her left arm and going to work and being referred to Dr. Burns. Dr. Burns placed Claimant on light work duty. Kathy Harrison, an occupational therapist, noted pain affecting her range of motion, abnormal posture, decreased strength and functioning. (Tr. 341). On October 21, 2008, Claimant reported decreased in aching to the elbow following edema massage, and she was instructed in self massage techniques and encouraged to perform stretches throughout work day. (Tr. 337). On October 23, 2008, she reported being able to move her arm better but not having any pain medication. (Tr. 338). In follow-up treatment, she reported her shoulder is feeling better, but she still has pain down to her elbow if talking on the telephone or working in one position. (Tr. 339). Ms. Harrison noted how Claimant has made significant gains during the past four visits and recommended continued treatment to improve posture and strength of posterior shoulder girdle and decrease pain in shoulder. (Tr. 339-40).

In the November 3, 2008 outpatient therapy note for shoulder rehabilitation, Claimant reported how she had been prescribed another three weeks of treatment and Naprosyn and a mild pain pill, because her doctor did not want her taking Vicodin. (Tr. 243). Ms. Harrison, the physical therapist, instructed Claimant to complete the rotation exercise at home and noted she tolerated the session well. (Tr. 243).

Claimant continued treatment with Outpatient Therapy Services on November 5, 2008 and at the end of the session, reported decreased in aching. (Tr. 328). Ms. Harrison continued the shoulder stabilization program on November 6 and 10, 20008. (Tr. 329-30). Ms. Harrison noted how Claimant appeared to be tolerating the strengthening exercises well. (Tr. 330). In follow-up on November 12 and 13, 2008, she reported pain over the distal portion of the olecranon at end

range extension of the left elbow. (Tr. 331-32). She continued the shoulder program on November 17, 19, and 24, 2008. (Tr. 333-35). In the Progress Update, Ms. Harrison noted how Claimant continued to demonstrate edema, and she remains unable to lift away from the center of gravity, and pain level remains moderate and recommend an orthopedic consultation to determine if there is a possible tear or ligament damage to the shoulder. (Tr. 336). Ms. Harrison found she had meet all of the treatment goals. (Tr. 336).

In follow-up treatment on December 1, 2008, Claimant reported experiencing gradual swelling and shakes that were painful at work. (Tr. 269). Examination showed a good range of motion and Dr. Burns continued her Ultram and Naprosyn medication regimen. (Tr. 269-70). On December 16, 2008, she reported some improvement with her left shoulder pain, but she has problems pulling sideways. (Tr. 267).

On January 16, 2009, Claimant reported continued pain and upper arm swelling. (Tr. 265). Dr. Burns continued her medication regimen. (Tr. 265).

Claimant complained of pain in her right foot and having to elevate the foot on computers at work during an office visit at the Bond Clinic on February 9, 2009. (Tr. 252). She noted back problems as her past medical history. Dr. Robert Pearson ordered a MRI. (Tr. 252). The x-ray of her right foot revealed no acute traumatic findings, a small ossific density adjacent to the lateral aspect of the base of the proximal phalanx of the fourth toe, and calcaneal spur. (Tr. 256).

The February 15, 2009, MRI Report of her lower extremity showed no pathologic infiltration of the bone marrow of the osseous structures of the foot. (Tr. 242, 254). Dr. Eduardo Escobar noted in the Impression that the MRI findings are indicative of plantar fasciitis in light of an associated calcaneal spur. (Tr. 242, 254).

On February 25, 2009, Claimant returned for podiatry follow-up treatment at the Bond Clinic and her MRI results. (Tr. 250). Dr. Pearson started injection therapy. (Tr. 250).

The March 11, 2009 MRI of her left shoulder showed a nonretracted supraspinatus tendon tear near the musculctendinous junction with degenerative changes of the AC joint and supraspinatus tendinosis at the lateral aspect of the tendon. (Tr. 277, 327).

In follow-up treatment on March 16, 2009, Claimant reported being terminated from job for not lifting a patient. (Tr. 263). Dr. Burns prescribed Vicodin. (Tr. 263).

On March 26, 2009, Dr, Richard Howard evaluated Claimant's left shoulder on referral by Dr. Burns. (Tr. 388-89, 392). She reported injuring her shoulder on October 1, 2008 while lifting a patient onto a bed. (Tr. 388). Dr. Howard reviewed the MRI and opined it showed a rotator cuff tear. Claimant reported undergoing therapy with no improvement. Examination showed positive impingement sign. (Tr. 388). Dr. Howard recommended that he perform left shoulder arthroscopy either a debridement and/or repair of the cuff. (Tr. 389).

On April 22, 2009, Dr. Howard performed left shoulder arthroscopy and debridement of rotator cuff and rotator cuff tear surgery. (Tr. 397-99).

On April 27, 2009, Dr. Howard prescribed Percocet and Ultram for pain and restricted her to very limited activity. (Tr. 359, 384-85). On May 28, 2009, Dr. Howard scheduled her to start the next phase of therapy. (Tr. 382-83, 391, 417).

In the June 3, 2009 initial evaluation and plan of care note, Ms. Harrison noted Claimant's chief complaint to be decreased mobility, strength, and functional use of her left shoulder and increased pain with movement away from her side. (Tr. 324, 410). She reported pain improved with pain medication and rest. Listed as her physician restrictions are no lifting over five pounds,

no pushing, pulling or reaching overhead. Examination showed trigger point tenderness along upper trapezius and rhomboid areas of left scapula. (Tr. 324, 410). Ms. Harrison discussed home exercise program and treatment goals including regaining functional use of left upper extremity. (Tr. 325, 411). On June 4, 9, 10, 11, 15, 17, 18, 22, and 24, 2009, Claimant completed treatment sessions. (Tr. 312-20). In the June 24, 2009 occupational therapy Progress Update, Claimant reported pain has decreased to 2-3/10 throughout the day and experiencing some pain along deltoid during range of motion, active exercises. (Tr. 322, 413). Ms. Harrison recommended continued treatment twice a week to improve strength and scapular stabilization. (Tr. 322, 413). On June 30, Claimant reported her doctor told her that her arm is operating how it should and how she is using her arm more frequently at home. (Tr. 321). Ms. Harrison noted how she was able to perform eccentric releases appropriately. (Tr. 321).

During treatment on June 25, 2009, Dr. Howard noted Claimant to be progressing well and having pain as expected. (Tr. 379-80). Examination showed she could get her arm overhead and her pain improving. Dr. Howard prescribed Vicodin and continued physical therapy sessions. (Tr. 379-80, 357, 409).

On July 1, 7, 8, 9, 14, 15, 16, 21, and 29, 2009, Claimant returned for occupational therapy sessions. (Tr. 300-09). Ms. Harrison noted how Claimant's progress is good, and she is demonstrating fair to good functional strength up to shoulder height and improving in scapular stability. (Tr. 300-01). On July 14, 2009, Claimant reported being pleased with her progress and being able to complete active flexion and abduction of left shoulder. (Tr. 304). In the July 22, 2009 Progress Update, Ms. Harrison recommended continued treatment to improve strength and scapular stabilization. (Tr. 310, 407). Claimant returned on July 29, 2009, after her doctor

ordered more therapy sessions.  (Tr. 309).

Claimant returned for follow-up treatment on July 23, 2009 on her left shoulder, status post rotator cuff repair.  (Tr. 377-78).  Examination showed she could reach overhead 150 degrees, abduction to 145, and external rotation to 90.  Dr. Howard determined to keep her on her weight restriction and in therapy.  (Tr. 377-78, 406).

On August 3, 5, 10, 12, 13, 17, 19, 24, 27, and 31, 2009, Claimant returned for occupational therapy sessions.  (Tr. 288-97).  On August 19, 2009, she reported how her doctor was pleased with her progress, and Ms. Harrison noted her posterior shoulder strength to be improving.  (Tr. 294).  In the August 17, 2009 Progress Update, Ms. Harrison noted Claimant has increased pain since her pain medication had been changed, and her posterior shoulder strength has improved.  (Tr. 298).

On August 18, 2009, Dr. Howard treated Claimant four months out from her shoulder scope and rotator cuff debridement with subacromial decompression and rotator cuff repair.  (Tr. 374-75).  Examination showed her shoulder motion to be excellent.  Dr. Howard decided to have her stay in rehab for another month.  (Tr. 374).

On September 3, 2009, Claimant reported discomfort during subscapularis release during occupational therapy.  (Tr. 282).  In a follow-up session on September 8, 2009, Ms. Harrison noted how Claimant to be making progress in both mobility and strength, but she continued to report relatively high pain rating at 5-6/10.  (Tr. 283).  Claimant reported being frustrated by high pain level and her pain medication not helping on September 14, 2009.  (Tr. 284, 400).  Claimant admitted to being more functional in all daily and household activities.  (Tr. 284, 400).  In the September 15, 2009 Progress Update, Ms. Harrison noted her shoulder strength has improved,

and she is doing more spontaneous reaching without guarding. (Tr. 286, 401, 404). Claimant reported being pleased with her progress except for the continued pain in her anterior shoulder. (Tr. 286, 401, 404). On September 17, 2009, Ms. Harrison discharged Claimant to home program and found she has met all treatment goals other than pain reduction. (Tr. 285).

On September 15, 2009, Claimant returned for five-month follow-up from her rotator cuff repair, and she reported persistent pain when she does activity with lifting. (Tr. 371-72). Examination showed she can reach overhead to 160 degrees, abduction/external rotation is to 90, and external rotation with arm at side is 60. Dr. Howard opined that [t]he patient's overall clinical picture would appear that she is making satisfactory progress with regard to healing of the tendon; however, the etiology of the persisting pain remains unclear." (Tr. 371). Dr. Howard order an MRI Arthrogram to reassess the tear to ensure that there has been complete healing and placed her on a 40-pound lifting restriction. (Tr. 371, 396).

On October 6, 2009, Claimant returned for follow-up treatment after her MRI Arthrogram showed a pre-tear of rotator cuff. (Tr. 367-68). The MRI showed post-operative changes of the rotator cuff particularly the supraspinatus tendon. (Tr. 395). Dr. Howard recommended scoping her shoulder and re-repair the failed section of tear. (Tr. 367-68).

On September 15, 2009, Dr. Howard prescribed one Valium to be taken one hour prior to the MRI orthrogram. (Tr. 356).

In a letter dated November 3, 2009, Dr. Howard noted as follows:

Donna is seen today in follow-up for her shoulder. She is now 6 months out from repair.

On exam she has full motion. She really has pretty good strength in abduction. She complains of persisting pain with abduction but no real weakness.

- 14 -

I advised her that based on the MRI, it appears that her repair has healed. I would recommend getting her into a Functional Capacity Evaluation to determine if there is anything further that we can address with therapy. In my view, she appears to be at maximum medical improvement. We will see her back after completion of the FCE.

(Tr. 363).

In the December 8, 2009 Functional Capacities Evaluation Summary Report completed by Susan Frost, an occupational therapist, on referral by Dr. Howard, Ms. Frost found Claimant has significant deficits in overhead work, left hand grip strength, crouching, all lifts, and repetitive squatting. (Tr. 343-44, 419-20). Ms. Frost noted Claimant worked as a patient care attendant and opined that she may benefit from exploring an alternate job such as clerical work. (Tr. 344, 420). In the Physical Examination Form, Ms. Frost noted Claimant has decreased left shoulder active range of motion and muscle strength, significant pain with range of motion movements, and decreased activities of daily living related to self care. (Tr. 351).

In a letter dated December 15, 2009, Dr. Howard noted as follows:

Donna is seen in follow-up for her rotator cuff repair. She is now 6 months out. She completed her Functional Capacity Evaluation which was done at Phelps County and this shows that she has some permanent limitations, specifically in overhead lifting of 10 pounds, floor to waist lifting about 30 pounds. I recommend that we make these permanent restrictions, as I think she is at maximum medical improvement. There is nothing further that I can offer her.

She continues to complain of pain in her shoulder, elbow and now her hand with some intermittent swelling. I do not observe any swelling today. I explained to her that I do not have any other treatment that I could offer her and in my opinion she is at maximum medical improvement.

She was not very satisfied with that and I advised her that certainly she is free to seek other opinions, but in my opinion there is nothing further that can be done. She is released from care and placed at maximum medical improvement.

(Tr. 362).

- 15 -

In a letter dated January 11, 2010, Dr. Howard noted as follows:

> Ms. Lawson was last seen on 12/15/09 and placed at maximum medical improvement having recovered from a rotator cuff repair of her left shoulder. She was placed at maximum medical improvement and released from care. I would place her on permanent lifting restrictions of overhead 10 pounds, floor to waist 30 pounds, I do not think any further treatment is going to change those. She has had less than optimal outcome from her surgery, but we have documented that her repair is intact. I am afraid that this is as good as she is going to get. She has a Permanent Partial Disability at the level of her shoulder of 20%. She is released from care.

(Tr. 360).

On the March 15, 2010, Shawn Berkin, D.O., performed an independent medical examination. (Tr. 425-32, 477-84). She complained of pain and tenderness to her left shoulder that radiates into her left arm and limited motion of her shoulder. (Tr. 428, 480). Examination showed diffuse tenderness over the left shoulder over the proximal humerus, superior surface, and upper trapezius posteriorly, and impingement test positive. (Tr. 428, 480). Dr. Berkin found Claimant to have rotator cuff tear of the left shoulder with impingement syndrome. (Tr. 430, 482). As to her disability rating, Dr. Berkin found Claimant to have a permanent partial disability of 40% of the left upper extremity at the level of the shoulder. (Tr. 431, 483). Dr. Berkin recommended nonsteroidal anti-inflammatory medication for control of her left arm and shoulder pain, participation in a home exercise program, limiting lifting with the left arm to 20 pounds on an occasional basis and 10 pounds on a frequent basis, and avoid lifting with her left arm extended from her body and excessive lifting or working with her left arm above shoulder level. (Tr. 431, 483). Dr. Berkin further noted that if Claimant is required to perform exertional activities for an extended period of time, she would need to take frequent breaks to avoid exacerbation of her symptoms or further injury to her left arm and shoulder. (Tr. 432, 484).

On October 22, 2010, Claimant reported left elbow pain during treatment at St. John's Clinic. (Tr. 442, 508, 532). She explained that she told Dr. Howard that her left elbow hurt, but he would not treat her left elbow and claimed her pain was never in her shoulder but has always been in her elbow. (Tr. 442, 508, 532). Psych examination showed Claimant to be alert and oriented to person, place, and time. (Tr. 443, 509, 533). Shoulder examination showed mild tenderness and limited range of motion by pain, and scapular motion to be normal. (Tr. 443, 509, 533). Examination of her elbow showed no degenerative changes and no evidence of fracture or dislocation. (Tr. 444). In the assessment, Dr. Kline found Claimant to have elbow pain and pain in joint, shoulder region. (Tr. 444, 534). Dr. Kline prescribed Hydrocodone. (Tr. 445).

Claimant received treatment in the emergency room at Phelps County Regional Medical Center on December 5, 2010 for right shoulder pain. (Tr. 450). The doctor provided her a sling and opined possible right rotator cuff injury. (Tr. 451). The radiology report showed moderate AC joint hypertrophy, and calcific tendinitis of the right shoulder but no acute abnormality. (Tr. 452).

In the February 17, 2011 treatment note from Phelps County Regional Medical Center, Claimant reported not having any emotional mental health problems. (Tr. 453-54 487-88). Examination showed normal range of motion of the extremities. (Tr. 455). Neuro/Psych examination showed oriented x3 and mood/affect to be normal. (Tr. 567).

On April 29, 2011, Dr. James Felts treated Claimant's reported elbow pain and pain in shoulder joint on referral by Dr. Kline. (Tr. 466, 535). Dr. Felts prescribed Hydrocodone. (Tr. 467). Dr. Felts noted Claimant to be alert and oriented to person, place, and time, and her affect not to be anxious or agitated. (Tr. 467, 501, 537). She returned on May 19, 2011, for a

medication refill. (Tr. 468, 500).

On May 31, 2011, Dr. Thomas Spencer completed a psychological evaluation to assist in the determination of Medicaid eligibility. (Tr. 504). Depression was her chief complaint, and she reported spiraling down physically and emotionally the past two years. Dr. Spencer noted she has not had any treatment for mental health issues. (Tr. 504). Dr. Spencer observed her motor behavior to be within normal limits and her mood to be very depressed. (Tr. 505). Dr. Spencer found Claimant to have a major depressive disorder and problems related to social environment, occupational and economic problems, and problems with access to health care. (Tr. 566). Dr. Spencer assessed her GAF to be 50-55. In the Determination of Incapacity, Dr. Spencer opined as follows: Based upon the available information, it is this examiner's opinion that Ms. Lawson has a mental illness, one which interferes with her ability to engage in employment suitable for her age, training, experience, and/or education.[2] The duration of the disability could exceed 12 months, but with appropriate treatment and compliance, prognosis improves. (Tr. 566).

In the office visit on August 4, 2011, Claimant discussed her continued elbow pain with Dr. Felts. (Tr. 465, 538). The x-ray of her left shoulder showed moderate AC arthrosis subacromial sclerosis. (Tr. 556-57). On August 8, 2011, Claimant reported continued pain in her shoulder and elbow. (Tr. 470). On August 19, 2011, Claimant reported feeling a lot of stress. (Tr. 527). Dr. Felts discussed smoking cessation in light of her high blood pressure. (Tr. 528). Claimant returned for a follow-up office visit on August 30, 2011, and Dr. Kline prescribed Hydrocodone as treatment of her continued left shoulder pain. (Tr. 511, 541). Dr. Felts treated

---

[2]A treating physician's opinion that a claimant is not able to return to work "involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005).

her with a Depo Medrol injection.  (Tr. 543).  Claimant returned on September 9, 2011, reporting

numbness and tingling in her hands, left elbow pain and joint pain in the shoulder region.  (Tr.

460, 544).  She smokes a package of cigarettes every day.  (Tr. 461).  Dr. Felts noted Claimant to

be alert and oriented to person, place, and time.  (Tr. 461, 545).  Dr. Felts prescribed

Hydrocodone for her pain and referred Claimant to Dr. Rieth for a nerve conduction study.  (Tr.

462, 546).  She returned on September 12, 2011, reporting severe shoulder pain.  (Tr. 462).

Claimant returned on October 6, 2011 to discuss the EMG results and for treatment of her

elbow pain.  (Tr. 547).  When Dr. Felts discussed administering injection as treatment, Claimant

declined the injection noting her pain not to be severe on that day.  (Tr. 549).  On October 21.

2011, Dr. Felts treated her elbow pain and joint pain in her left shoulder.  (Tr. 524).  She reported

how Medicaid declined coverage for additional MRIs.  (Tr. 525). She broke out in hives so Dr.

Felts discontinued HCTZ and refilled her Hydrocodone prescription.  (Tr. 525-26).  The October

22, 2011 x-ray of her cervical spine showed no gross facet arthrosis.  (Tr. 550-51).  The x-ray of

her left elbow showed no degenerative changes, and no evidence of fractures or dislocation.  (Tr.

552-53).  Claimant returned for treatment on November 30, 2011, and reported tingling in both

legs and her lower back has been hurting.  (Tr. 520).  On January 20, 2012, Claimant reported she

still has some issues with her left shoulder but doing better.  (Tr. 516).

On February 20, 2012, Claimant returned for medication refills and reported having

continued left shoulder and left elbow pain.  (Tr. 492-94).  Dr. Felts prescribed Hydrocodone.

(Tr. 495).

On February 29, 2012, Claimant reported chronic low back pain becoming worse after

helping/lifting husband.  (Tr. 565, 581).  Dr. Felts prescribed Hydrocodone as treatment.  (Tr.

583). The image of her lumbar spine showed disc space narrowing at L5-S1 with associated facet joint. (Tr. 570).

On March 9, 2012, Dr. Felts treated Claimant for low back pain radiating to both legs and thoracic back pain and prescribed physical therapy and meloxicam. (Tr. 571, 573). In the Impression, Dr. Felts noted disc space narrowing at L5-S1 with associated facet joint arthropathy. (Tr. 572, 585). In the office visit on April 30, 2012, Claimant complained of back pain and no improvement with physical therapy. (Tr. 586).

In a "To Whom It May Concern" letter dated May 14, 2012, Dr. Felts noted as follows:

> Ms. Lawson suffers from chronic back pain dating to a patient lifting incident in 2000 and left shoulder pain related to another lifting incident in 2008. She has had left shoulder surgery without benefit and recently completed physical therapy without benefit.

(Tr. 579, 587).

In a "To Whom It May Concern" letter dated July 11, 2012, Dr. Felts noted as follows:

> It is my opinion that Ms. Lawson is unable to work due to chronic back and shoulder pain.

(Tr. 588).[3]

## IV. The ALJ's Decision

The ALJ found Claimant meets the insured status requirements of the Social Security Act through December 31, 2014. (Tr. 12). The ALJ found that Claimant has not engaged in substantial gainful activity since February 25, 2009, the alleged onset date. (Tr. 12). The ALJ found that the medical evidence establishes that Claimant has the severe impairments of rotator

---

[3] A treating physician's opinion that a claimant is not able to return to work "involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005).

cuff tear of the left shoulder with impingement syndrome with history of arthroscopy with debridement, repair and decompression, and lateral epicondylitis of the elbow, but no impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 12-16). After careful consideration of the entire record, the ALJ found that Claimant had the residual functional capacity to perform light work except she is limited to lifting ten pounds frequently and twenty pounds occasionally with the left arm. (Tr. 16). The ALJ further found she should avoid lifting with the left arm extended away from the body and shoulder; excessive lifting or working with the left arm above shoulder level. Moreover, if Claimant is required to perform exertional activities for an extended time, she must take frequent breaks to avoid exacerbation of symptoms/injury to the left arm and shoulder, and she must be able to alternate positions sitting or standing every thirty to sixty minutes. (Tr. 16).

The ALJ found that Claimant is unable to perform any past relevant work. (Tr. 21). The ALJ noted how Claimant was born on September 26, 1959, which is defined as a younger individual age 45-49 on the alleged date of disability, but that she subsequently changed age category to closely approaching advanced age. She has a limited education and is able to communicate in English. Next, the ALJ found transferability of job skills is not material to the determination of disability, because using the Medical-Vocational Rules as a framework a finding that Claimant is not disabled whether or not she has transferable job skills. (Tr. 21). Considering her age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she can perform such as cashier/parking lot attendant and office helper. (Tr. 21-22). Finally, the ALJ concluded Claimant has not been under a disability from February 25, 2009, through the date of her decision. (Tr. 22).

## V.    Discussion

In a  disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled.  First, the ALJ must determine whether the individual is engaged in "substantial gainful activity."  If she is, then she is not eligible for disability benefits.  20 C.F.R. § 404. 1520(b).  If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant is not found to have a severe impairment, she is not eligible for disability benefits.  If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling.  If the impairment is specifically listed or is equal to a listed impairment,

the claimant will be found disabled.  20 C.F.R. § 404.1520(d).  If the impairment is not listed or is

not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the

claimant is capable of doing past relevant work.  If the claimant can still perform past work, she is

not disabled.  20 C.F.R. § 404.1520(e).  If the claimant cannot perform past work, the ALJ

proceeds to step five in which the ALJ determines whether the claimant is capable of performing

other work in the national economy.  In step five, the ALJ must consider the claimant's "age,

education, and past work experience."  Only if a claimant is found incapable of performing other

work in the national economy will she be found disabled.  20 C.F.R. § 404.1520(f); see also

Bowen, 482 U.S. at 140-42 (explaining five-step process).

       Court review of an ALJ's disability determination is narrow; the ALJ's findings will be

affirmed if they are supported by "substantial evidence on the record as a whole."  Pearsall, 274

F.3d at 1217.  Substantial evidence has been defined as "less than a preponderance, but enough

that a reasonable mind might accept it as adequate to support a decision."  Id.  The court's review

"is more than an examination of the record for the existence of substantial evidence in support of

the Commissioner's decision, we also take into account whatever in the record fairly detracts

from that decision."  Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The Court will

affirm the Commissioner's decision as long as there is substantial evidence in the record to

support his findings, regardless of whether substantial evidence exists to support a different

conclusion.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

       In reviewing the Commissioner's decision, the Court must review the entire administrative

record and consider:

       1.      The credibility findings made by the ALJ.

2.      The claimant's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The claimant's subjective complaints relating to
        exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of the
        claimant's impairments.

6.      The testimony of vocational experts when required which
        is based upon a proper hypothetical question which sets forth the claimant's
        impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

        The ALJ's decision whether a person is disabled under the standards set forth above is

conclusive upon this Court "if it is supported by substantial evidence on the record as a whole."

Wiese , 552 F.3d at 730 (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008).

"Substantial evidence is less than a preponderance but is enough that a reasonable mind would

find it adequate to support the conclusion."  Wiese, 552 F.3d at 730 (quoting Eichelberger v.

Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)).  When reviewing the record to determine whether

the Commissioner's decision is supported by substantial evidence, however, the Court must

consider evidence that supports the decision and evidence that fairly detracts from that decision.

Id.  The Court may not reverse that decision merely because substantial evidence would also

support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001), or it

might have "come to a different conclusion." Wiese, 552 F.3d at 730.  Thus, if "it is possible to

draw two inconsistent positions from the evidence and one of those positions represents the

agency's findings, the [Court] must affirm the agency's decision."  Wheeler v. Apfel, 224 F.3d

891, 894-95 (8th Cir. 2000).  See also Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (the

ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the

available zone of choice") (internal quotations omitted).

Claimant contends that the ALJ's decision is not supported by substantial evidence on the

record as a whole, because the ALJ failed to find her depression and lumbago to be severe

impairments.  Claimant further argues that the ALJ's RFC determination is not supported by

substantial evidence inasmuch as the ALJ failed to consider all of her limitations and analyze the

medical opinions.

A.      Depression and Lumbago as a Medically Determinable Impairments

Claimant contends that the ALJ failed to find her depression and lumbago to be a severe

medically determinable impairments.

To show an impairment is severe, a claimant must show that she has a (1) medically

determinable impairment or combination of impairments which (2) significantly limits her physical

or mental ability to perform basic work activities without regard to age, education, or work

experience.  See   20 C.F.R. §§ 404.1520(c). 404.1521(a), §§ 416.920(c), 416.921(a).  "An

impairment is not severe if it amounts only to a slight abnormality that would not significantly limit

the claimant's physical or mental ability to do basic work activities."  Kirby v. Astrue, 500 F.3d

705, 707 (8th Cir. 2007).  In other words, if it is not medically determinable or has no more than a

minimal effect on the plaintiff's ability to work.  Nguyen v. Chater, 75 F.3d 429, 431 (8th Cir.

1996).

"A 'severe impairment is defined as one which significantly limits [the claimant's] physical

or mental ability to do basic work activities.'"  Martise v. Astrue, 641 F.3d 909, 923 (8th Cir.

2011) (quoting <u>Pelkey v. Barnhart</u>, 433 F.3d 575, 578 (8th Cir. 2006)) (alteration in original). Such an impairment "'must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms.'" <u>Id.</u> (quoting 20 C.F.R. § 404.1508) (alteration in original).

The ALJ found Claimant's depression and lumbago not to be severe medically determinable impairments. The undersigned finds that substantial medical evidence supports this determination.

Here, the ALJ's determination that Claimant's depression is not a severe impairment is supported by substantial evidence in the record. The ALJ rejected Claimant's claim of severe impairment by finding that her depression did not result in any restrictions of activities of daily living; difficulties in maintaining social functioning; difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. (Tr. 14).

Next, the ALJ noted how the medical record does not document any specialized mental health treatment, and how she has not required psychiatric hospitalizations and no physician has recommended more aggressive psychological treatment. <u>See</u> <u>Banks v. Massanari</u>, 258 F.3d 820, 826 (8th Cir. 2001) (claim of disabling depression was inconsistent with lack of ongoing treatment for same and with improvement of depression once claimant started taking anti-depressants); <u>Holland v. Apfel</u>, 153 F.3d 620, 622 (8th Cir. 1998) (finding claimant not disabled by depression in absence of any ongoing treatment for depression). The undersigned notes in the February 17, 2011 treatment note from Phelps County Regional Medical Center, Claimant reported not having any emotional mental health problems, and the neuro/Psych examination showed oriented x3 and mood/affect to be normal. The record shows she neither sought nor received psychiatric treatment

during the time of her alleged disability.  See Novotny v. Chater, 72 F.3d 669, 671 (8th Cir. 1995) (a lack of regular and sustained treatment is an indication that the claimant's impairments are non-severe and not significantly limiting for twelve continuous months); Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) (the failure to seek treatment may be considered as inconsistent with a finding of disability).

Nor did the ALJ err in finding that the depression Claimant did have was situational in nature.  Indeed, when testifying, Claimant indicated that she has crying spells a couple of times each week, but she failed to report such crying spells during treatment except during the evaluation by Dr. Spencer.  Indeed, Dr. Spencer found that her depressive problems to be related to social environment, occupational and economic problems, and  problems with access to health care.  In Gates v. Astrue, 627 F.3d 1080. 1082 (8th Cir. 2010), the Eighth Circuit affirmed the ALJ's finding that a claimant's depression and anxiety were not severe but were situational in nature and improved with a regimen of medication and counseling.  The diagnosis of major depressive disorder was largely based on Claimant's own statements and did not include any opinions as to any corresponding functional limitations.  Id.  See also Holland v. Apfel, 153 F.3d 620, 622 (8th Cir. 1998) (affirming finding that depression was not severe when claimant had been prescribed antidepressant after mother's death, but had no ongoing treatment).

As noted by the ALJ, Dr. Spencer's diagnosis of major depressive disorder "relied quite heavily on the subjective reports of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported."  (Tr. 15).  Further, Dr. Spencer opined at the end of the evaluation he rated Claimant's GAF score of 50-55.  See Goff v. Barnhart, 421 F.3d 785,791 (8th Cir.2005) (GAF score of 58, indicative of moderate

symptoms, was inconsistent with opinion of treating psychiatrist that claimant's depression was severe). The record shows no healthcare provider imposed any functional limitations on her as a result of her depression. See e.g. Gates v. Astrue, 627 F.3d 1080, 1082 (8th Cir. 2010) (affirming ALJ's decision at step two that claimant's depression was not severe; supporting that decision were, inter alia, absence of any opinions about claimant's functional limitations accompanying diagnoses of depression by various physicians and reliance for diagnoses on claimant's own statements); Davidson v. Astrue, 578 F.3d 838, 844 (8th Cir. 2009) (affirming ALJ's decision that claimant's major depressive disorder was not disabling given lack of any functional limitations caused by depression that were more than moderate and evidence that depression was controllable with medication). Indeed, Dr. Spencer noted that with appropriate treatment and compliance, her prognosis improved. Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (an impairment controlled by medication or treatment is not considered disabling); Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (impairments controllable or amenable to treatment do not support finding of total disability).

Indeed, the undersigned finds the record is devoid of Claimant reporting depression or depressive symptoms to any treating physician except for the consultative examiner. Likewise, the ALJ properly considered the fact that Claimant had not sought any treatment from a psychiatrist, psychologist, or counselor. (Tr. 14). See Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000) ("The absence of any evidence of ongoing counseling or psychiatric treatment or of deterioration or change in [a claimant's] mental capabilities disfavors a finding of disability."); Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) (claimant's failure to seek medical assistance for alleged physical and mental impairments contradicts subjective complaints of disabling conditions

and supports the ALJ's decision to deny benefits); Vanlue v. Astrue, 2012 WL 4464797, at *12 (E.D. Mo. Sept. 26, 2012) (affirming the ALJ's finding that depression was not a severe impairment where the claimant had sought only minimal and conservative treatment and had never required more aggressive forms of mental health treatment). The record shows Claimant sought no treatment from a psychiatrist, psychologist or counselor and never required more aggressive forms of mental health treatment. See Craig v. Chater, 943 F.Supp. 1184, 1189 (W.D. Mo. 1996) ("Allegations of a disabling impairment may be properly discounted because of inconsistencies such as minimal or conservative medical treatment.").

With respect to Claimant's lumbago, the record shows she received the diagnosis in February, 2012 and thus did not have the requisite duration of twelve months required for this impairment to be disabling. Her lumbago had not lasted for twelve months or more and, thus, did not meet the duration requirement. Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). Not only the impairment but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months. Barnhart v. Walton, 535 U.S. 212, 217-18 (2002). Thus, the ALJ's decision is supported by substantial evidence in fining that Claimant's lumbago was not a severe impairment that significantly limited her ability to perform basic work-related activities for twelve consecutive months. The undersigned finds that Claimant's lumbago was not a severe impairment which lasted twelve months or longer is supported by substantial evidence.

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the

record as a whole. An ALJ's decision is not to be disturbed "'so long as the ... decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusions had [the Court] been the initial finder of fact.'" Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)). Although Claimant articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above. Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

B.    Residual Functional Capacity

    Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, inasmuch as the ALJ failed to consider all of her limitations and analyze the medical opinions. A claimant's RFC is what he can do despite his limitations. Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001). The claimant has the burden to establish his RFC. Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). The ALJ determines a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations. Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); Eichelberger, 390 F.3d at 591; 20 C.F.R. § 404.1545(a). The ALJ is "required to consider at least some supporting evidence from a [medical professional]" and should therefore obtain medical evidence that addresses the claimant's ability to function in the workplace. Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (internal quotation marks and citation omitted). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. Id.

In her decision, the ALJ thoroughly discussed the medical evidence of record and Claimant's daily activities. See Gray v. Apfel, 192 F.3d 799, 803-04 (8th Cir. 1999) (ALJ properly discredited claimant's subjective complaints of pain based on discrepancy between complaints and medical evidence, inconsistent statements, lack of pain medications, and extensive daily activities). The ALJ then addressed several inconsistencies in the record to support her conclusion that Claimant's complaints were not credible.

Specifically, the ALJ noted that no treating physician in any treatment notes stated that Claimant was disabled or unable to work or imposed significant long-term physical and/or mental limitations on Claimant's capacity for work. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987) (examining physician's failure to find disability a factor in discrediting subjective complaints). The absence of objective medical basis to support Claimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints. Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012); Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995)(lack of objective findings to support pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994)(the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints). Further, the ALJ noted that Claimant's subjective complaints were not supported or consistent with the clinical observations, diagnostic imaging, and findings of the objective medical evidence of record.

In addition, the ALJ noted that no physician had ever made any medically necessary

restrictions, restrictions on her daily activities, or significant functional limitations.  Brown v. Chater, 87 F.3d 963, 964-65 (8th Cir. 1996) (lack of significant medical restrictions imposed by treating physicians supported the ALJ's decision of no disability).  Likewise, the ALJ  noted how the medical record is devoid of any evidence showing that Claimant's condition has deteriorated or required aggressive medical treatment.  Chamberlain v. Shalala, 47 F.3d 1489, 1495 (8th Cir. 1995) (failure to seek aggressive medical care is not suggestive of disabling pain); Walker v. Shalala, 993 F.2d 630, 631-32 (8th Cir. 1993)( lack of ongoing treatment is inconsistent with complaints of disabling condition).   The ALJ found that "[t]he limited treatment record is inconsistent with the alleged severity of the functional limitations and diminishes the credibility of those allegations."  (Tr.18).  The ALJ further opined "[i]n addition, even when the claimant is seeking treatment, the objective findings show that the claimant's surgical repair is generally well healed and her functionality is improved."  (Tr. 18).  The ALJ concluded based on the medical record, "claimant's symptoms may not be accurately reported, may not exist at the level of severity assumed by the claimant's testimony at the hearing and may have other mitigating factors against their negative impact on the claimant's ability to engage in work activity."  (Tr. 18-19).

After injuring her shoulder in October 2008 while working as a patient care assistant, a MRI of her left shoulder in March 2009 revealed a tear of the supraspinatus tendon at the musculctendinous junction with tendinosis and degenerative changes of the acromioclavicular joint. Dr. Howard performed left shoulder arthroscopy and debridement of rotator cuff, subacromial decompression, and rotator cuff repair in April 2009.  The progress notes from the physical therapy sessions noted that she was gradually progressing in terms of strength, mobility, and range of motion, but Claimant reported ongoing pain in her left upper extremity.  Claimant reported

being more functional in all of her activities of daily living and household activities and engaging in less guarding behavior and being pleased with her progress and being able to complete active flexion and abduction of left shoulder. In follow-up treatment, Dr. Howard observed she had progressed following surgery finding that she has full range of motion and good strength in abduction with no weakness. In December 2009, Dr. Howard found Claimant to be at maximum medical improvement and placed her on permanent work restrictions of ten pounds overhead lifting and thirty pounds floor to waist lifting with her left arm.

After being released from Dr. Howard's care, Claimant received limited treatment until seeking treatment in the emergency room with complaints of right shoulder pain in December 2010. The radiology report showed moderate AC joint hypertrophy, and calcific tendinitis of the right shoulder but no acute abnormality. Subsequent treatment notes show Claimant has non-tender extremities and normal range of motion although she continued to report shoulder and elbow pain. An x-ray of her left shoulder showed only moderate AC arthrosis subacromial sclerosis. Indeed in the January 2012 treatment note, she reported still having some problems with her left shoulder but doing better.

In the March 2010 medical evaluation, Dr. Berkin found Claimant could lift twenty pounds with her left arm occasionally and ten pounds frequently but she should avoid lifting with her left arm extended from her body and avoid excessive lifting of the left arm above the shoulder. Dr. Berkin also found that if she was required to perform exertional activities for an extended period of time , she should pace herself and take frequent breaks to avoid exacerbation of her left arm and shoulder symptoms.

The ALJ accorded great weight to Dr. Berkin's opinions set forth in the evaluation and

some weight to the functional limitations assessed by Dr. Howard, and noted how Dr. Howard's functional limitations to be generally consistent with the findings and the residual functional capacity set forth in her decision.

The ALJ also properly considered the inconsistencies between Claimant's allegations of debilitating conditions and her daily activities. The ALJ noted how she admitted activities of daily living including attending to her personal hygiene with some assistance, caring for her disabled husband, preparing simple meals, performing light household chores, going shopping, and driving a car. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001) ("[i]nconsistencies between subjective complaints of pain and daily living patterns diminish credibility"); Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996) (affirming ALJ's discount of claimant's subjective complaints of pain where claimant was able to care for one of his children on daily basis, drive car infrequently, and go grocery shopping occasionally). Further, the ALJ noted how her own admissions suggest Claimant is generally capable of engaging in a range of activities consistent with the limitations set forth in the residual functional capacity. Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) ("The ALJ may discount subjective complaints of physical and mental health problems that are inconsistent with medical reports, daily activities, and other such evidence."); See Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) (finding that activities such as driving, shopping, watching television, and playing cards were inconsistent with the claimant's complaints of disabling pain).

In support of his credibility findings, the ALJ noted that no physician who examined Claimant found her to have limitations consistent with disability. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) ("We find it significant that no physician who examined [claimant] submitted a medical conclusion that she is disabled and unable to perform any type of work.").

The lack of medical evidence supporting Claimant's complaints was a proper consideration when evaluating her credibility, see Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006), as was her failure to pursue more aggressive treatment. See Tate v. Apfel, 167 F.3d 1191, 1197 (8th Cir. 1999). Likewise, the record shows Claimant sought only minimal and conservative treatment and never required more aggressive forms of mental health treatment. See Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000) (absence of evidence of ongoing counseling or psychiatric treatment disfavors finding of disability). Likewise, the ALJ noted how the medical record is devoid of any evidence showing that Claimant's condition has deteriorated or required aggressive medical treatment. Chamberlain v. Shalala, 47 F.3d 1489, 1495 (8th Cir. 1995) (failure to seek aggressive medical care is not suggestive of disabling pain); Walker v. Shalala, 993 F.2d 630, 631-32 (8th Cir. 1993)( lack of ongoing treatment is inconsistent with complaints of disabling condition).

After engaging in a proper credibility analysis, the ALJ incorporated into Claimant's RFC those impairments and restrictions found to be credible. See McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir. 2003) (the ALJ "properly limited his RFC determination to only the impairments and limitations he found credible based on his evaluation of the entire record."). The ALJ determined that the medical evidence supported a finding that Claimant could perform light work except she is limited to lifting ten pounds frequently and twenty pounds occasionally with her left arm. (Tr. 16). In relevant part, the ALJ opined as follows: "The claimant should avoid lifting with the left arm away from the body and shoulder..." and "should avoid excessive lifting or working with the left arm above shoulder level." (Tr. 16).

As demonstrated above, a review of the ALJ's decision shows the ALJ not to have denied relief solely on the lack of objective medical evidence to support her finding that Claimant is not

disabled. Instead, the ALJ considered all the evidence relating to Claimant's subjective complaints, including the various factors as required by <u>Polaski</u>, and determined Claimant's allegations not to be credible. Although the ALJ did not explicitly discuss each <u>Polaski</u> factor in making his credibility determination, a reading of the decision in its entirety shows the ALJ to have acknowledged and considered the factors before discounting Claimant's subjective complaints. <u>See</u> <u>Brown v. Chater</u>, 87 F.3d 963, 966 (8th Cir. 1996). Inasmuch as the ALJ expressly considered Claimant's credibility and noted numerous inconsistencies in the record as a whole, and the ALJ's determination is supported by substantial evidence, such determination should not be disturbed by this Court. <u>Id.</u>; <u>Reynolds v. Chater</u>, 82 F.3d 254, 258 (8th Cir. 1996). Because the ALJ gave multiple valid reasons for finding Claimant's subjective complaints not entirely credible, the undersigned defers to the ALJ's credibility findings. <u>See</u> <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 801(8th Cir. 2005).

The undersigned finds that the ALJ considered Claimant's subjective complaints on the basis of the entire record before her and set out the inconsistencies detracting from Claimant's credibility. The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. <u>Battles v. Sullivan</u>, 902 F.2d 657, 660 (8th Cir. 1990). The ALJ pointed out inconsistencies in the record that tended to militate against the Claimant's credibility. <u>See</u> <u>Guilliams</u>, 393 F.3d at 801 (deference to ALJ's credibility determination is warranted if it is supported by good reasons and substantial evidence). Those included Claimant's conservative medical treatment, her lack of significant functional restrictions by any physicians, her daily activities, and the objective medical record. The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court is bound by the ALJ's

determination.  See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006); Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992).  Accordingly, the ALJ did not err in discrediting Claimant's subjective complaints of pain.  See Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001)(affirming the ALJ's decision that claimant's complaints of pain were not fully credible based on findings, inter alia, that claimant's treatment was not consistent with amount of pain described at hearing, that level of pain described by claimant varied among her medical records with different physicians, and that time between doctor's visits was not indicative of severe pain).

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole.  An ALJ's decision is not to be disturbed "'so long as the ... decision falls within the available zone of choice.  An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusions had [the Court] been the initial finder of fact.'"  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)).  Although Claimant articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above.  Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that  the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

The parties are advised that they have fourteen  (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of

the right to appeal questions of fact.  <u>See</u> <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990).

<u>/s/ Terry I. Adelman             </u>

UNITED STATES MAGISTRATE JUDGE

Dated this <u>10th  </u> day of July, 2014.